**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Brittney Walker & Dushanna Jones, | |
| *Plaintiffs,* | No. 21 CV 5780 |
| v. | Judge Lindsay C. Jenkins |
| Walgreens Specialty Pharmacy, LLC, d/b/a AllianceRX Walgreens Prime, LLC, | |
| *Defendant.* | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Dushanna Jones and Brittney Walker are current and former customer service representatives, respectively, at call centers operated by Defendant Walgreens Specialty Pharmacy, LLC ("Walgreens"). In this putative collective and class action, Plaintiffs allege that Defendant required them and other customer service representatives to perform unpaid labor before and after each shift. They seek relief for this allegedly unlawful practice under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*, and several state labor laws.[1] Plaintiffs propose to litigate each of their claims in a representative capacity—the FLSA claims on behalf of a nationwide collective of similarly-situated employees under 29 U.S.C. § 216(b); and the state claims on behalf of classes certified pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3). To date, eight employees (not counting Plaintiffs)—from six States, including Illinois, Ohio, Florida, Texas, North Carolina, and

---

[1]     Walker, a resident of Ohio, asserts claims under Article II, § 34A of the Ohio Constitution, and the Ohio Minimum Fair Wage Standards Act ("OMFWSA"), OHIO REV. CODE ANN. § 4111.03 (West 2022). Jones, a resident of Illinois, brings claims under the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*

Pennsylvania—have filed notices of consent with the Court expressing their desire to opt in to the collective action. *See* [Dkt. No. 5 and exhibits]; [Dkt. No. 6 and exhibit].

Defendant has moved to dismiss all but one of Plaintiffs' claims on a variety of grounds.[2] [Dkt. No. 31]. *First*, Defendant seeks to compel arbitration of Walker's claims under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, and to dismiss those claims pursuant to Federal Rule of Civil Procedure 12(b)(3). [Dkt. No. 31, ¶¶ 4, 7]; [Dkt. No. 33, 10 n.4].[3] *Second*, Defendant seeks to dismiss Plaintiffs' nationwide Fair Labor Standards Act claim for lack of personal jurisdiction under Rule 12(b)(2). [Dkt. No. 31, ¶¶ 5, 7]. *Third*, Defendant seeks to dismiss all of Plaintiffs' overtime claims—those brought under state and federal law alike—for failure to state a claim under Rule 12(b)(6). [*Id.* at ¶¶ 6–7]; [Dkt. No. 33, 7].

For the reasons that follow, Defendant's motion is granted in part and denied in part. Beginning with Defendant's effort to compel arbitration, the Court holds that the plain meaning of Walker's unambiguous arbitration agreement cannot be stretched to cover Walker's claims against Defendant—not, at least, without adding language to the agreement that is not there. This, the Court lacks the authority to do, under either Illinois law or the FAA. *Stichter v. Zuidema*, 269 Ill. App. 3d 455, 206 Ill. Dec. 929, 646 N.E.2d 296, 299 (Ill. App. Ct. 1995); *Granite Rock Co. v. Int'l*

---

[2]     Defendant concedes that Jones's IWPCA claims should move forward. Because Defendant's briefs do not make any argument for dismissing Plaintiffs' FLSA recordkeeping claims, that claim must move forward as well, irrespective of whether the Court grants Defendant's motion.

[3]     Citations to exhibits refer to the electronic pagination provided by CM/ECF, not necessarily the page numbers contained in the underlying document.

*Bhd. of Teamsters*, 561 U.S. 287, 302 (2010). Accordingly, Walker is entitled to bring her claims in this Court, her chosen judicial forum, and Defendant's request for an ordering compelling arbitration is denied.

The personal jurisdiction issue is much less straightforward. Defendant has conceded that this Court has jurisdiction over it with respect to Jones's claims. [Dkt. No. 33, 15 n.4]. And as the Court will explain in greater detail below, Defendant has waived—or at least abandoned—any challenge to the Court's jurisdiction over it with respect to Walker's claims as well. In light of that waiver, Defendant's motion to dismiss Plaintiffs' nationwide FLSA claim amounts to little more than a request that the Court prospectively narrow the scope of any collective action it eventually certifies. Courts in this Circuit generally decline to rule on such motions prior to conditional certification. *See, e.g.*, *Zigler v. Edward D. Jones & Co.*, ___ F. Supp. 3d ____, 2023 WL 3918966, at *3 (N.D. Ill. 2023) The Court finds that approach sound, and follows it here. It therefore denies Defendant's 12(b)(2) motion without prejudice to renewal after the Court rules on conditional certification.

On the merits of Plaintiffs' overtime claims, the Court agrees with Defendant that the First Amended Complaint does not provide sufficient detail to "'state a claim to relief that is plausible on its face.'" *McCauley v. City of Chi.*, 671 F.3d 611, 615 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The complaint is not far off, though, and Plaintiffs should be able to clear the bar imposed by Rule 12(b)(6) without much difficulty. Accordingly, the Court dismisses those claims with leave to

file a Second Amended Complaint correcting the deficiencies identified in this opinion.

I.   **Background**

First, some housekeeping. The parties have adduced substantial evidence outside the pleadings in support of and in opposition to Defendant's motion to compel arbitration and motion to dismiss for lack of personal jurisdiction. *See* [Dkt. No. 33-1]; [Dkt. No. 33-2]; [Dkt. No. 33-3]; [Dkt. No. 33-4]; [Dkt. No. 35-1]; [Dkt. No. 35-2]; [Dkt. No. 35-3]; [Dkt. No. 35-4]; [Dkt. No. 35-5]; [Dkt. No. 35-6]; [Dkt. No. 35-7]; [Dkt. No. 63-1]; [Dkt. No. 63-2].[4] While the Court can consider such evidence for purposes of deciding those motions, its ruling on Defendant's motion to dismiss cannot stray from the four corners of the complaint. *See* FED. R. CIV. P. 12(d). Accordingly, the Court dedicates this Section exclusively to summarizing the allegations of the First Amended Complaint and this case's somewhat tortured procedural history. The Court will introduce other facts from the record, where relevant, in the analysis section.

A.   **Factual Allegations**

The complaint can be quickly summarized as follows. Defendant "operates call centers." [Dkt. No. 28, ¶ 16]. It staffs these call centers with "customer service representatives, which Defendant has also referred to as, *inter alia*: patient care coordinators, customer care specialists, and call center agents." [*Id.*]. The Court

---

[4]      Plaintiffs' motion for conditional certification, [Dkt. No. 36], is supported with additional evidence as well. *See, e.g.*, [Dkt. No. 36-2] (Jones Declaration); [Dkt. No. 36-3] (Walker Declaration).

follows Plaintiffs' lead and refers to all of these employees as "customer service representatives" or "CSRs" for short.

Although the tasks CSRs perform are allegedly the same, CSRs vary in a number of important respects. For instance, although some CSRs work at physical call centers, many work remotely as well. [*Id.* at ¶ 17]. Additionally, although many CSRs are permanent employees, Defendant also hires CSRs on a temporary basis, often through staffing agencies. [*Id.* at ¶¶ 21, 23–26]. Both Plaintiffs began their tenure with Defendant as temps. [*Id.* at ¶¶ 23–24].

Defendant hired Jones in August of 2018 to work as a CSR at its Bannockburn, Illinois, call center. [*Id.* at ¶ 21]. Jones initially worked on-site, but transitioned to remote work in October of 2018. [*Id.*]. In January of 2019—while Jones was still working remotely—Defendant made Jones a permanent employee. [*Id.* at ¶ 23]. In March of 2020, Jones returned to the Bannockburn facility for a few months, before returning to remote work in June of 2020. [*Id.* at ¶ 21]. Jones has worked from her home in Zion, Illinois ever since. [*Id.*].

Plaintiff Walker's employment history with Defendant is more complicated. Walker began working for Defendant as a remote CSR in February of 2021. [*Id.* at ¶ 20]. She secured this position through a staffing agency. [*Id.* at ¶ 24]. Unlike Jones, Walker has never worked at a physical call center and was never made a permanent employee. [*Id.*]. Rather, Walker worked remotely from the date she was hired to the date her employment with Defendant ended in September of 2021. [*Id.* at ¶¶ 20, 24]. During this time, Walker resided in Cincinnati, Ohio. [*Id.* at ¶ 18]. Although the

complaint does not say whether Walker worked from home, it is reasonable to infer that she did.

The complaint says little about either Plaintiffs' day-to-day responsibilities as CSRs, or about the work performed by Defendant's call centers in general. It does allege, however, that before Plaintiffs could fulfill their duties on any particular day, they had to boot up and log into "Defendant's computer systems, numerous software applications, and call system." [*Id.* at ¶¶ 29, 31]. These systems were allegedly indispensable to the work they performed as CSRs. Plaintiffs simply could not "perform their work" without them. [*Id.* at ¶ 35]. Just as Plaintiffs were required to call up Defendants' systems at the beginning of the day, they were required to shut those systems down at the end of the day as well. [*Id.* at ¶ 36]. The complaint does not estimate how long it took to accomplish complete either of these processes.

Defendant paid Plaintiffs an hourly wage. [*Id.* at ¶ 27]. Defendant kept track of the hours each Plaintiff worked using a timekeeping system. [*Id.* at ¶¶ 33, 40]. Although the specifics of this system do not appear in the complaint, Plaintiffs could apparently clock in or out with relative ease. [*Id.*] Although there was no "administrative difficulty of recording" the time Plaintiffs spent calling up and booting down Defendant's systems, Defendant allegedly required Plaintiffs to perform this work off the clock. [*Id.* at ¶¶ 29, 36].

Plaintiffs claim that they "regularly worked 40 or more hours per week," [*id.* at ¶ 28], and that, as a consequence of Defendant's willful refusal to track the time they spent executing these tasks, they were (1) not paid for all hours worked and (2)

did not receive sufficient overtime compensation for weeks in which they worked more than 40 hours. [*Id.* at ¶¶ 29–31, 36–39, 43–45]. They also allege that Defendant "failed to make, keep and preserve records of" this unpaid work. [*Id.* at ¶ 46].

### B. **Procedural History**

Walker commenced this lawsuit on October 28, 2021. [Dkt. No. 1]. At that time, she was the sole plaintiff. Her original complaint brought claims under the FLSA, the OMFWSA, and Article II, § 34A of the Ohio Constitution. [*Id.* at ¶ 1]. The allegations of Walker's original complaint are substantially the same as those of the First Amended Complaint. [*id.* at ¶¶ 13–41]. Then, as now, Walker sought to litigate her FLSA claims as a collective action and her state claims on behalf of a Rule 23 class. [*Id.* at ¶ 42] (collective action); [*id.* at ¶ 43] (state class).

Within two weeks of filing suit, eight individuals filed notices of consent with the Court, expressing their desire to opt in to the nascent collective action.[5] [Dkt. No. 5]; [Dkt. No. 6]. In lieu of answering the complaint, Defendant moved for an order compelling Walker to arbitrate her claims pursuant to an arbitration agreement, discussed below, that she entered into with the temporary staffing agency that placed her at Defendant. [Dkt. No. 17, ¶¶ 1–4, 8]. Alternatively, Defendant moved to dismiss the case "in its entirety" for lack of personal jurisdiction. [*Id.* at ¶¶ 5–8]. In support of the latter ground for dismissal, Defendant argued that the Court could exercise

---

[5]     Two are residents of Illinois. [Dkt. No. 5-1]; [Dkt. No. 5-3]. Two more are residents of Florida. [Dkt. No. 5-2]; [Dkt. No. 6-1]. The remaining four are residents of separate States. [Dkt. No. 5-4] (Ohio); [Dkt. No. 5-5] (Pennsylvania); [Dkt. No. 5-6] (Texas); [Dkt. No. 5-7] (North Carolina).

neither general nor specific jurisdiction over Walker's claims. [*Id.* at ¶¶ 6–7] [Dkt. No. 18, 7].

On February 17, 2022, Walker filed an amended complaint adding Jones as "an additional named Plaintiff." [Dkt. No. 27, ¶ 4]. Jones sought to join Walker as a representative plaintiff in the FLSA collective action. She also brought new claims under IMWL and IWPCA. Like Walker, Jones sought to bring each of her State law claims on behalf of a Rule 23 class. [Dkt. No. 28, ¶¶ 60–61].[6]

Not long after the First Amended Complaint was filed, Defendant renewed its motion to dismiss. [Dkt. No. 31]. There are two primary differences between this motion and that which came before. First, unlike the original motion, the renewed motion moves to dismiss Plaintiffs' overtime claims on the merits for failure to state a claim. Second, and as the Court will discuss in greater detail below, Defendant's renewed challenge to personal jurisdiction completely omits its previous challenge to this Court's jurisdiction to adjudicate Walker's claims. *Compare* [Dkt. No. 18, 14–20] *with* [Dkt. No. 33, 15–19].

Plaintiffs responded, and moved for an order conditionally certifying the case as a collective action under the FLSA, authorizing expedited discovery into potential opt-in plaintiffs, and adopting a procedure for notifying those potential opt-ins of the opportunity to join the collective. [Dkt. No. 36] (motion); [Dkt. No. 37] (brief in support). The Court terminated that motion without prejudice to refiling it after the

---

[6]     Plaintiff filed a brief opposing Defendant's original motion to compel after she amended her complaint. [Dkt. No. 29]. The Court deemed that motion moot in light of the amended complaint, and the Court does not consider it here. [Dkt. No. 30].

Court ruled on Defendant's motion to compel arbitration. [Dkt. No. 39]. Consequently, Plaintiffs' putative collective action remains uncertified.

II. **Legal Standards**

A. **Personal Jurisdiction**

Nothing in the Federal Rules of Civil Procedure requires a plaintiff to "alleg[e] personal jurisdiction in the complaint." *Curry v. Revolution Lab's*, 949 F.3d 385, 392 (7th Cir. 2020). However, "'once the defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction.'" *Id.* (quoting *Purdue Rsch. Found. v. Sanofi Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)). The strength of that burden depends on whether the court rules on the motion with or without "the benefit of an evidentiary hearing." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423 (7th Cir. 2010). Where the Court does *not* hold a hearing, the plaintiff "bears only the burden of making a prima facie case for personal jurisdiction." *Id.*

A court evaluating a 12(b)(2) motion generally must accept the truth of the complaint's well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. Where, however, the defendant challenges the complaint's jurisdictional allegations with evidence—affidavits or declarations, for instance— "'the plaintiff has an obligation to go beyond the pleadings and submit affirmative evidence'" of her own. *Sorsby v. TruGreen Ltd. P'ship*, 2020 WL 7641288, at *2 (N.D. Ill. Dec. 23, 2020) (quoting *Shanahan v. Nat'l Auto Prot. Corp.*, 2020 WL 3058088, at *1 (N.D. Ill. June 9, 2020)); *see also Purdue Rsch. Found.*, 338 F.3d at 783.

If the plaintiff fails to do so, the presumption flips and the court "will accept as true any facts in the defendant['s] affidavits that do not conflict with" evidence introduced by the plaintiff. *Curry*, 949 F.3d at 393; *Swanson v. City of Hammond, Ind.*, 411 Fed. App'x 913, 915 (7th Cir. 2011) (accepting "allegations relating to personal jurisdiction as true except where the defendants refute them through undisputed affidavits"). Where the plaintiff does come forward with evidence of her own, she is entitled to resolution in her favor of all "'disputes concerning relevant facts presented in the record.'" *Curry*, 949 F.3d at 393 (quoting *Purdue Rsch. Found.*, 338 F.3d at 782).

B.   **Motion to Compel Arbitration**

"The [Federal Arbitration Act] was enacted in 1925 in response to widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). The statute "directs courts to place arbitration agreements on equal footing with other contracts . . . ." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 293 (2002). To this end, 9 U.S.C. § 2—the FAA's "substantive mandate"—"makes written arbitration agreements 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of a contract.'" *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 629–30 (2009) (quoting 9 U.S.C. § 2).

"When a party who has agreed to arbitrate a dispute instead brings a lawsuit," 9 U.S.C. § 3 "entitles the defendant to file an application to stay the litigation." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1710–11 (2022). Such a stay does not by its own force require the plaintiff to do anything, it merely puts the federal proceeding

10

on hold. Where the plaintiff nonetheless refuses to arbitrate, however, a defendant may petition the court under 9 U.S.C. § 4 for an order compelling the plaintiff to submit her claims to arbitration. *Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 474–75 (1989). Such a motion should be granted if three "elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *Scheurer v. Fromm Fam. Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017).

### C.    **Motion to Dismiss for Failure to State a Claim**

Rule 8(a)(2) requires that all civil complaints "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a) & (a)(2). This pleading standard is satisfied only when the complaint "contain[s] allegations that 'state a claim to relief that is plausible on its face.'" *McCauley*, 671 F.3d at 615 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678 (internal quotations omitted)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *McCauley*, 671 F.3d at 615 (quoting *Iqbal*, 556 U.S. at 678).

A motion to dismiss under Rule 12(b)(6) avers that the well-pleaded factual allegations of the complaint fail to meet this minimum threshold. "In reviewing the sufficiency of a complaint under the plausibility standard," courts "accept the well-pleaded facts in the complaint as true, but legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley*, 671 F.3d at 616. "Making the plausibility

determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

## III. Analysis

Defendant moves to dismiss Plaintiffs' claims on three grounds—(1) mandatory arbitration under the FAA; (2) lack of personal jurisdiction under Rule 12(b)(2); and (3) failure to state a claim under Rule 12(b)(6). [Dkt. No. 31, 1–2]. The Court will begin with personal jurisdiction.[7]

### A. Personal Jurisdiction

Defendant moves under Rule 12(b)(2) to "dismiss Plaintiffs' nationwide Fair Labor Standards Act . . . claim" for lack of personal jurisdiction. [Dkt. No. 31, ¶¶ 5, 7]. At first glance, the scope of this motion is difficult to ascertain. On closer examination, however, it is apparent that Defendant challenges *not* this Court's jurisdiction to entertain either Plaintiff's individual claims, but rather its jurisdiction to entertain the claims of non-resident opt-in plaintiffs. The Court reaches this conclusion for two reasons. First, Defendant expressly concedes "that the Court has

---

[7] A court "may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). It goes without saying that Defendant's motion to dismiss Plaintiffs' overtime claims would constitute a ruling on the merits. It appears to be an open question, however, whether an order compelling arbitration would as well. Although the Supreme Court has held that courts "ha[ve] leeway 'to choose among threshold grounds for denying audience to a case on the merits,'" *Sinochem*, 549 U.S. at 431 (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584–85 (1999)), it has stressed that any such ruling cannot "entail [the] assumption by the court of substantive 'law-declaring power.'" *Sinochem*, 549 U.S. at 433 (quoting *Ruhrgas*, 526 U.S. at 584–85). There are myriad reasons to think that an order compelling arbitration—especially one grounded on the application of state contract law—involves the assumption of substantive law-declaring power. Out of an abundance of caution, then, the Court opts to decide the personal jurisdiction issue first, before ruling on Defendant's motion to compel Walker to arbitrate her claims.

personal jurisdiction over Jones' FLSA claims to the limited extent it involves *only* Illinois residents."[8] [Dkt. No. 33, 15 n.4]. And second, a careful reading of Defendant's motion reveals that Defendant has waived, or at least abandoned, the personal jurisdiction defense it previously asserted against Walker.

The latter conclusion requires explanation, for it has important implications for this case. As the Court discussed above, this is not Defendant's first motion to dismiss for lack of personal jurisdiction. In lieu of answering Walker's original complaint, Defendant moved to "dismiss [the] action in its entirety pursuant to FRCP 12(b)(2)." [Dkt. No. 17, ¶ 5]. In support of that motion, Defendant dedicated several pages of argument to explaining why, in its view, the Court lacked general or specific personal jurisdiction over Walker's claims. [Dkt. No. 18, 14–20]. As to specific jurisdiction, Defendant emphasized that it had no contacts with Illinois related in any way to the work Walker performed for Defendant in Ohio. [*Id.* at 18–20]. The Court never ruled on that motion, however, and it was terminated without prejudice in light of the filing of the First Amended Complaint. [Dkt. No. 30].

Defendant renewed its motion to dismiss a month later. [Dkt. No. 31]. The opening brief Defendant filed in support of that motion, [Dkt. No. 33], it is fair to say, repeats most of the material Defendant filed in support of the original motion. Defendant's arguments for compelling arbitration, for instance, are more-or-less identical. *Compare* [Dkt. No. 18, 9–13] *with* [Dkt. No. 33, 10–14]. Notwithstanding

---

[8] By this, Defendant presumably means to concede that the Court has jurisdiction both to adjudicate Jones's individual FLSA claim (and by implication her IMWL and IWPCA claims) as well as a collective action comprised of opt-in employees resident in Illinois.

this similarity, the renewed motion omits entirely the previous motion's argument that the Court cannot exercise specific personal jurisdiction over Walker's claims.

In its place, Defendant made an entirely new argument—dismissal is appropriate because "Plaintiffs may not," consistent with *Bristol-Meyers Squibb Co. v. Sup. Ct. of Cal.*, 137 U.S. 1773 (2017), "pursue a nationwide FLSA collective action in this District." [Dkt. No. 33, 19]. In stark contrast to Defendant's original motion, the renewed motion makes no Walker-specific jurisdiction argument at all.

Defendant's decision not to re-raise its previous jurisdictional objection can only be viewed as a waiver, or at least abandonment, of the personal jurisdiction challenge and defend against Walker's claims on their merits. Like most other individual rights, a personal jurisdiction defense can be waived. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982); *Hedeen Int'l, LLC v. Zing Toys, Inc.*, 811 F.3d 904, 906 (7th Cir. 2016).

In light of that waiver, the scope of Defendant's motion to "dismiss Plaintiffs' nationwide FLSA claim" for lack of personal jurisdiction, [Dkt. No. 31, ¶ 5], comes into clearer focus. At issue is not whether the Court can exercise personal jurisdiction over Defendant with respect to Plaintiffs' *individual* claims, but rather whether the Court can exercise personal jurisdiction over it with respect to the claims of opt-in employees whose alleged injuries occurred outside of Illinois. So framed, Defendant challenges only the scope of Plaintiffs' collective action, seeking to limit participation to opt-ins resident in Illinois. [Dkt. No. 33, 15 n.4].

14

Defendant's position rests on three premises: *first*, that under *Bristol-Myers-Squibb*, the Court must possess an independent basis for exercising personal jurisdiction over the claims of every opt-in Plaintiff, [Dkt. No. 33, 19]; *second*, that the Court lacks general jurisdiction over Defendant because it is not "at home" in Illinois, [Dkt. No. 33, 15–18]; and *third*, that the Court will generally lack a basis for exercising specific jurisdiction over the claims of non-resident opt-ins, whose injuries will have, by-and-large, arisen from work completed for Defendant outside of Illinois. *See* [Dkt. No. 33, 15 n.4].[9]

Plaintiffs, for their part, argue that the Court can exercise general jurisdiction over Defendant, [Dkt. No. 35, 14–17], and that, even if it cannot, the opt-in Plaintiffs need not establish personal jurisdiction at all. [*Id.* at 18–20]. Plaintiffs analogize to the class action context, in which federal courts have long been thought to possess the authority to entertain nationwide class actions, provided they have personal jurisdiction over the Defendant with respect to the named plaintiffs' claims. [*Id.* at 18–19]; *see also Mussat v. IQVIA, Inc.*, 953 F.3d 441, 445 (7th Cir. 2020).

These arguments have given rise to a circuit split among the courts of appeals. *Compare Fischer v. Fed. Express Corp.*, 42 F.4th 366, 370 (3d Cir. 2022) (holding that "where the basis of personal jurisdiction in an FLSA collective action in a federal court is specific personal jurisdiction established by serving process according to Federal Rule of Civil Procedure 4(k)(1)(A), every plaintiff who seeks to opt in to the

---

[9]     This third argument is implicit in Defendant's request that any collective action the Court eventually certifies be limited to Illinois residents.

suit must demonstrate his or her claim arises out of or relates to the defendant's minimum contacts with the forum state"), *and Canaday v. Anthem Cos., Inc.*, 9 F.4th 392, 397–400 (6th Cir. 2021) (same), *with Waters v. Day & Zimmermann NPS, Inc.*, 23 F.4th 84, 93–97 (1st Cir. 2022) (agreeing with *Canaday* and *Fischer* that opt-in plaintiffs must demonstrate an independent basis for personal jurisdiction over their claims, but holding that they may do so under the Fifth Amendment); *see also Wilkerson v. Walgreens Specialty Pharmacy LLC*, ___ F. Supp. 3d ____, 2022 WL 15520004, at *4 (D. Ariz. Oct. 27, 2022) (collecting district court cases).

The Court declines to wade into this dispute in this case's current posture. Defendant does not seek the dismissal of any of the eight employees who have expressed a desire to opt in to Plaintiffs' collective action thus far. Indeed, its briefs do not mention them at all.[10] What Defendant seeks is a prospective limitation of the scope of any collective action the Court eventually certifies. Courts in this circuit (and elsewhere) consistently decline the invitation to issue such abstract legal pronouncements and, instead, defer such rulings until after conditional certification. *See, e.g.*, *Zigler*, 2023 WL 3918966, at *3; *Parker v. IAS Logistics DFW, LLC*, 2021 WL 170788, at *4 (N.D. Ill. Jan. 19, 2021); *Iannotti v. Wood Grp. Mustang*, 2021 WL 2805812, at *5 (S.D. Ill. July 6, 2021) ("'Defendants generally cannot preemptively

---

[10]    Even if Defendant *had*, the Court lacks any information about these employees aside from their address at the time they executed their notice of consent. This is not nearly enough information to determine—one way or the other—whether the Court can exercise specific personal jurisdiction over Defendant with respect to their claims. It is, of course, possible that a non-resident opt-in worked in Illinois and moved outside of the State, or worked in Illinois while commuting from outside of the State. So the mere fact that an opt-in employee is not an Illinois resident does not, as an absolute matter, foreclose specific jurisdiction.

prevent a party from joining a suit due to lack of jurisdiction; they must wait until the party attempts to join, then move for dismissal.'" Quoting *Knecht v. C & W Facility Servs., Inc.*, 534 F. Supp. 3d 870, 876 (S.D. Ohio 2021), *abrogated on other grounds*, 68 F.4th 1003 (6th Cir. 2023)).

The rationale underpinning these cases is convincing. It will therefore deny Defendant's motion to "dismiss Plaintiffs' nationwide Fair Labor Standards Act . . . claim," [Dkt. No. 31, ¶¶ 5, 7], without prejudice to renewal after the Court rules on Plaintiffs' motion for conditional certification.

### B.  Motion to Compel Arbitration

The Court next considers Defendant's motion to compel Plaintiff Walker to submit her claims to arbitration. As the complaint briefly alludes, Plaintiff Walker was not directly hired by Defendant. [Dkt. No. 28, ¶ 24]. Instead, she landed her job with Defendant through Spherion Staffing, LLC ("Spherion"), a temporary staffing agency.[11] [Dkt. No. 33-2, ¶¶ 4–7].

---

[11]    The exact process by which Plaintiff Walker was assigned to work for Defendant is quite convoluted. Spherion's sole—and, therefore, controlling—member is another LLC, SFN Group LLC ("SFN"). [Dkt. No. 33-2, ¶ 1]. SFN is, in turn, controlled by its sole member, Randstad North America, Inc. ("RNA"). [*Id.*]. RNA is parent to a number of other subsidiaries, including Randstad Technologies, LLC ("Randstad Technologies"). [Dkt. No. 63-1, ¶ 4]. Randstad Technologies is, like Spherion—its corporate nephew—a temporary staffing agency. [Dkt. No. 63-2, ¶ 6]. Before Spherion hired Walker, Randstad Technologies partnered with a third, apparently unaffiliated, temporary staffing agency—Tata Consultancy Services Limited ("TCS")—to help TCS fulfill a contract it had entered into with Defendant on August 1, 2020. [*Id.* at ¶¶ 4, 6]; [Dkt. No. 33-2, ¶ 6]. That contract required TCS to provide Defendant with "dedicated agents to handle inbound calls" and "other customer services." [Dkt. No. 63-2, at ¶ 4]. The terms of the temporary staffing services agreement between Randstad Technologies and TCS is not in the record. [Dkt. No. 33-2, ¶ 6]. At some point in 2021, however, Randstad Technologies "was unable to provide [the] temporary workers" TCS needed to fulfill TCS's contract with Defendant. [Dkt. No. 63-1, ¶ 5]. To cover the shortfall, Randstad Technologies "referred TCS to . . . Spherion," which "ultimately provided TCS with Spherion employees to provide temporary, remote staffing services" for Defendant. [*Id.*]

Spherion hired Walker in February of 2021. [Dkt. No. 33-2, ¶ 5]. Shortly thereafter, Spherion presented Walker with a two-page "Agreement to Arbitrate," [Dkt. No. 33-2, pp. 4–5], which she signed electronically on February 10, 2021. [*Id.* at 5.]. That agreement contains three critical clauses. The first—call it the operative clause—articulates the core promise Plaintiff made by signing the agreement:

> As consideration for accepting or continuing my employment with Spherion, [*sic*] and I agree to use binding arbitration, instead of going to court, for any "Covered Claims" that arise between me and Spherion, including its divisions, operating companies, affiliates, related companies, subsidiaries and parent company, and/or their current or former employees * * * *.

[*Id.* at 4]. The second—call it the third-party beneficiary clause—provides:

> I also understand that any Spherion clients to which I provide services on assignment are intended third-party beneficiaries of this agreement.

[*Id.*]. The third—call it the definitional clause—defines the phrase "Covered Claims," as it is used in the operative clause. It provides:

> "Covered Claims" are any legal claims that relate to my recruitment, hire, employment, client assignments and/or termination including, but not limited to, those concerning wages or compensation, consumer reports, benefits, contracts, discrimination, harassment, retaliation, leaves of absence or accommodation for a disability.

[*Id.*]

Defendant is not a signatory to this agreement. Nonetheless, Defendant argues that it is a "client" of Spherion within the meaning of the contract, and, therefore, a

---

According to the declaration of Muralidharan Balasubramanyam, a Business Partner at TCS, Spherion employees—including Walker—were referred to TCS by Randstad and then interviewed by TCS for placement with Defendant. [*Id.* at ¶¶ 8–9]. If the candidates were to TCS's liking, they were then "assign[ed]" to TCS on a "temporary" basis, [Dkt. No. 33-2, ¶ 6], and then *reassigned*—by TCS, not Spherion—to Defendant. [*Id.* at ¶ 7].

third-party beneficiary. In this capacity, Defendant seeks an order (1) "compelling . . . Walker to arbitrate her claims" and (2) dismissing her claims under Federal Rule of Civil Procedure 12(b)(3). [Dkt. No. 31, p. 1 & ¶ 4]; [Dkt. No. 33, 7, 10–14]; [Dkt. No. 38, 2–7].

Defendant's effort to enforce the Spherion Agreement raises two distinct questions of contract interpretation. The first is whether Defendant is a "client" of Spherion within the meaning of the third-party beneficiary clause. If the answer to this question is yes, the second question is whether Walker's claims against Defendant fall within the scope of the operative clause. To resolve these issues, it is necessary to survey Illinois law governing both contract interpretation in general and the rights of third-party beneficiaries more specifically. *See Volt Info. Scis.*, 489 U.S. at 495–96 (courts "apply[] general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Act"). Although the Court applies principles of Illinois contract law,[12] it must do so "'with a healthy

---

[12]     The choice-of-law question before the Court is, like many aspects of this case, hardly a straightforward one. When a federal court sits in diversity, choice-of-law analysis is simple—the *Erie* doctrine requires that courts apply "the choice-of-law rules of the forum state" in which they sit. *Fin. Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654, 661 n.3 (7th Cir. 2022); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The forum State's choice-of-law rules likewise apply to the determination of which law governs state claims over which a federal court exercises supplemental jurisdiction. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). But the Court has searched in vain for a Seventh Circuit decision dealing with a case like this one—where the choice-of-law question asks which law should apply to the interpretation of an arbitration agreement that would require the dismissal (or at least the stay of) *both* federal and state claims. The parties' briefs provide no guidance—they omit any discussion of choice-of-law at all. Defendant, for its part, exclusively cites to cases applying Illinois law. And although Plaintiffs support their arguments with citations to cases applying both Illinois and Ohio law, *see, e.g.*, [Dkt. No. 35, 10], they do not argue for the application of either or identify any difference between the two. Compounding this silence, the arbitration agreement itself lacks a choice-of-law provision. Because both parties rely on Illinois law—and because neither party has advocated for the application of

regard for the federal policy favoring arbitration.'" *Cont'l Cas. Co. v. Am. Nat. Ins. Co.*, 417 F.3d 727, 731 (7th Cir. 2005) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983)).

In Illinois, "[t]he primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 226 Ill. 2d 208, 314 Ill. Dec. 133, 874 N.E.2d 43, 58 (Ill. 2007). Illinois courts recognize, however, that the "best indication of the parties' intent" is the "plain and ordinary meaning" of the contract's terms. *Id.* Accordingly, Illinois—like many other States—applies a "'four corners'" approach to contract interpretation. *Platinum Supplemental Ins., Inc. v. Guarantee Tr. Life Ins. Co.*, 989 F.3d 556, 563 (7th Cir. 2021) (quoting *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998)). That approach looks "initially to the language of [the] contract alone," *Gallagher*, 874 N.E.2d at 58, and if the contract language "'appears to admit of only one interpretation, the case is indeed over.'" *Bourke*, 159 F.3d at 1036 (quoting *AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 574 (7th Cir. 1995)).

To put it another way, although contracts "must be construed to give effect to the intention of the parties," "when there is no ambiguity in the terms of the

_____

any other State's law—the Court will apply the choice-of-law rules of Illinois, just as it would if it were sitting in diversity or if the motion to compel arbitration targeted only state claims. *Cf. Gay v. CreditInform*, 511 F.3d 369, 388–89 (3d Cir. 2007); *Aneke v. Am. Express Travel Related Servs., Inc.*, 841 F. Supp. 2d 368, 375 (D.D.C. 2012). "Illinois courts engage in a choice-of-law analysis only if there is a conflict between Illinois law and the law of another state such that 'a difference in law will make a difference in the outcome.'" *W. Side Salvage, Inc. v. RSUI Indem. Co.*, 878 F.3d 219, 223 (7th Cir. 2017) (quoting *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 316 Ill. Dec. 505, 879 N.E.2d 893, 898 (Ill. 2007)). Neither party has done so in this case, so the Court "applies the law of the forum state," Illinois. *W. Side Salvage*, 878 F.3d at 223.

[agreement]," the parties' intent "must be determined from the language of the [agreement] alone." *Flora Bank & Tr. v. Czyzewski*, 222 Ill. App. 3d 382, 164 Ill. Dec. 804, 583 N.E.2d 720, 725 (Ill. App. Ct. 1991); *see also Thompson v. Gordon*, 241 Ill. 2d 428, 349 Ill. Dec. 936, 948 N.E.2d 39, 47 (Ill. 2011) ("If the words in the contract are clear and unambiguous, they *must* be given their plain, ordinary and popular meaning." (emphasis added)).

Ambiguity here is the whole ball game. So what is ambiguity? The Illinois Supreme Court has instructed that contract language is ambiguous only if—read in the context of the entire agreement—it "is susceptible to more than one meaning." *Gallagher*, 874 N.E.2d at 58; *see also Thompson*, 948 N.E.2d at 47. Ambiguity is a semantic concept. At issue is not whether the parties' intended to accomplish, but which linguistic interpretations the words of the agreement—as they actually exist— will bear. "A court will find ambiguity if the contract language is 'obscure in meaning through indefiniteness of expression.'" *Id.* at 48 (quoting *Cent. Ill. Light Co.*, 213 Ill. 2d 141, 290 Ill. Dec. 155, 821 N.E.2d 206, 213 (Ill. 2004)). Still, a contract is "not rendered ambiguous merely because the parties disagree on its meaning." *Thompson*, 948 N.E.2d at 48. And Illinois courts "do not strain to find ambiguity where none exists." *AFM Mattress Co. v. Motorists Com. Mut. Ins. Co.*, 37 F.4th 440, 443 (7th Cir. 2022) (citing *Hobbs v. Hartford Ins. Co. of the Midwest*, 214 Ill. 2d 11, 291 Ill. Dec. 269, 823 N.E.2d 561, 564 (Ill. 2005)); *McGinley Partners, LLC v. Royalty Props., LLC*, 427 Ill. Dec. 270, 117 N.E.3d 1207, 1226, 2018 IL App (1st) 171317, ¶ 66 (Ill. App. Ct. 2018).

These principles have no less force in the arbitration context. The Illinois Supreme Court has stressed that although "arbitration is a favored method of dispute resolution," "parties . . . are bound to arbitrate only those issues they have agreed to arbitrate, as shown by the clear language of the agreement and their intentions expressed in that language." *Salsitz v. Kreiss*, 198 Ill. 2d 1, 260 Ill. Dec. 541, 761 N.E.2d 724, 731 (Ill. 2001). Accordingly, "[a]n arbitration agreement will not be extended by construction or implication." *Salsitz*, 761 N.E.2d at 731; *see also Flood v. Country Mut. Ins. Co.*, 41 Ill. 2d 91, 242 N.E.2d 149, 151 (Ill. 1968). As Illinois' highest Court explained in *United Cable Television Corp. v. Northwest Illinois Cable Corp.*,

> [t]he public policy favoring the submission of disputes to arbitration does not allow us to do violence to the expressed intention of the parties or to ignore the fundamental that an agreement to submit a dispute to arbitration is contractual nature. Courts have consistently held that one can be required to arbitrate only what one has agreed to arbitrate.

128 Ill.2d 301, 131 Ill. Dec. 172, 538 N.E.2d 547, 551 (Ill. 1989).

Regarding third-party beneficiaries, under the FAA, state law governs whether an arbitration agreement may "be enforced by or against nonparties to the contract . . . ." *Arthur Andersen*, 556 U.S. at 630–31 (2009). In Illinois, "[a] nonsignatory to a contract typically has no right to invoke an arbitration provision contained in that contract." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 639 (7th Cir. 2021); *Cont'l Cas. Co.*, 417 F.3d at 734. There are exceptions, however, including the third-party beneficiary doctrine. *Dannewitz v. Equicredit Corp. of Am.*, 333 Ill. App. 3d 370, 266 Ill. Dec. 627, 775 N.E.2d 189, 192 (Ill. App. Ct. 2002). Under that doctrine, "if a contract is entered into for the direct benefit of a third person, the third person may sue for a breach of

22

the contract"—or, as here, attempt to enforce it—"in his or her own name, even though the third person is a stranger to the contract and the consideration." *Olson v. Etheridge*, 177 Ill. 2d 396, 226 Ill. Dec. 780, 686 N.E.2d 563, 404 (Ill. 1997).

"Whether someone is a third-party beneficiary depends on the intent of the contracting parties, as evidenced by the contract language." *Martis v. Grinnell Mut. Reinsurance Co.*, 388 Ill. App. 3d 1017, 329 Ill. Dec. 82, 905 N.E.2d 920, 924 (Ill. App. Ct. 2009). "Illinois courts . . . recognize a 'strong presumption against conferring contractual benefits on noncontracting third parties,'" *Sosa*, 8 F.4th at 639 (quoting *Marque Medicos Farnsworth, LLC v. Liberty Mut. Ins. Co.*, 427 Ill. Dec. 218, 117 N.E.3d 1155, 1159, 2018 IL App (1st) 163351, ¶ 12 (Ill. App. Ct. 2018)), which can generally only be overcome by "an express provision in the contract identifying the third-party beneficiary by name or by description of a class to which the third party belongs." *Martis*, 905 N.E.2d at 924; *Holmes v. Fed. Ins. Co.*, 353 Ill. App. 3d 1062, 289 Ill. Dec. 750, 820 N.E.2d 526, 530 (Ill. App. Ct. 2004).

With these principles in hand, the Court turns to interpreting the Spherion Arbitration Agreement. The first question is whether Defendant is a third-party beneficiary under Illinois, such that it can compel arbitration as a non-signatory. The answer to that question turns on whether the contract language evinces a clear intent to confer a direct benefit on Defendant.

Although the agreement does not identify Defendant by name, it does identify a class of "intended third-party beneficiaries"—"Spherion clients to which [Walker] provide[s] services on assignment." [Dkt. No. 33-2, 4]. This language is undoubtedly

23

sufficient to overcome the "strong presumption" against the existence of third-party beneficiaries. Indeed, it is precisely the kind of "express declaration" Illinois courts have deemed sufficient. *155 Harbor Drive Condo. Ass'n v. Harbor Point, Inc.*, 209 Ill. App. 3d 631, 154 Ill. Dec. 365, 568 N.E.2d 365, 375 (Ill. App. Ct. 1991).

Still, it does not follow from the fact that Walker and Spherion intended that *some* entities would benefit from the contract that Defendant is one of them. To put the point doctrinally, that the parties desired to confer a direct benefit on a class of third-party beneficiaries does not necessarily mean that Defendant is a member of that class. Only "Spherion clients" are covered. In a previous order, the Court sought supplemental briefing "on the question whether Defendant is," in fact, "a 'client' of Spherion Staffing, LLC, within the meaning of Plaintiff Walker's arbitration agreement." [Dkt. No. 57]. In response, Defendant filed two additional declarations clarifying the nature of the relationship between Spherion and Defendant. As summarized in footnote 11, the picture that emerged from supplemental briefing is convoluted. Although the Court remains skeptical that Defendant is a Spherion "client" within the ordinary meaning of that word, this question can be resolved on a far more straightforward basis.

Assuming, *arguendo*, that Defendant is a "Spherion client" and, therefore, an intended third-party beneficiary of the Spherion Arbitration Agreement, Defendant would be entitled to "no more than the signatories provided . . . ." *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989); *Chi. White Metal Casting, Inc. v. Treiber*, 162 Ill. App. 3d 562, 115 Ill. Dec. 42,

24

517 N.E.2d 7, 11 (Ill. App. Ct. 1987) ("[A] party relying on a third-party beneficiary theory must take the contract as the original parties made it and is bound by all of its provisions."); *Xinos v. Vill. of Oak Brook*, 298 Ill. App. 3d 520, 232 Ill. Dec. 576, 698 N.E.2d 667, 670 (Ill. App. Ct. 1998) ("A third-party beneficiary must take the contract as he finds it and can get no more than the signatories provided.").

This is where Defendant runs into problems. Textually, the Spherion Arbitration Agreement applies only to "'Covered Claims' that arise between [Walker] and Spherion."[13] [Dkt. No. 33-2, 4]. Even when the agreement is construed as a whole, there is nothing ambiguous about its limitation to claims "between [Walker] and Spherion." The plain and ordinary meaning of "Spherion" is, well, Spherion. What Defendant seeks is not an interpretation of the word "Spherion," but an *expansion* of the arbitration clause that brings it into line with the apparent intent of the parties to benefit third-party beneficiaries. In essence, Defendant would have the Court replace "'Covered Claims' that arise between Walker and Spherion" with "'Covered Claims' that arise between Walker, Spherion, *and Spherion clients to which Walker provides services on assignment.*"

Such a conclusion could scarcely be called interpretation. Tellingly, neither Defendant's motion nor its briefs explain how the actual language of the operative clause can linguistically bear the meaning it asks the Court to give to it. Instead, it focuses on why—as a matter of common sense and industry practice—it would *make*

---

[13]     It also applies to Covered Claims arising between Plaintiff and any of Spherion's divisions, operating companies, affiliates, related companies, subsidiaries," Spherion's "parent company," and any of these entities' "current or former employees." [Dkt. No. 33-2, 4]. Defendant does not claim to fall within any of these categories.

*sense* to enforce the agreement that way. Defendant emphasizes, for instance, that "the very purpose of a staffing and/or temporary placement agency is to place the agency's employees in various work assignments with its clients," and that, "[b]y virtue of the staffing and/or temporary placement agency business model, any agreement between such an agency and its employees is meant to extend to the end customer, who is the true user of the worker's services." [Dkt. No. 33, 13]. These points are well taken, but they have no bearing on what the contract itself says—and how the language of that contract *can* be interpreted under Illinois law. All they tell us is that it would have made a whole lot of sense to draft the agreement differently.

Defendant does raise two textual arguments in support of its interpretation, but neither is convincing. First, Defendant emphasizes the breadth of the definitional clause, which defines "Covered Claims" to encompass "any legal claims" relating to Walker's "recruitment, hire, employment, client assignments and/or termination including, but not limited to, those concerning wages or compensation." [Dkt. No. 38, 3]. Defendant appears to argue that because this definition lacks the Spherion limitation present in the agreement's operative clause, that it somehow expands the scope of the agreement. [*Id.*].

This argument can be easily dispatched with. The definition of "Covered Claims" is precisely that—a definition—intended to give concrete meaning to the otherwise meaningless phrase "'Covered Claims' that arise between [Walker] and Spherion" in the agreement's operative clause. [Dkt. No. 33-2, 4]. The definitional clause itself contains no agreement to arbitrate. Its only purpose is to flesh out the

operative clause. And once the definition of "Covered Claims" is slotted in to that clause, the Spherion limitation remains. That the definition of "Covered Claims" is not limited to claims arising between Walker and Spherion makes complete sense— doing so would be entirely redundant given that the definitional and operative clauses can only have any effect when read together.

Defendant's second textual argument is stronger, but still unavailing. Invoking the principle that courts "will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used," *Thompson*, 948 N.E.2d at 47, Defendant argues that Plaintiffs' interpretation would render much of the agreement without any conceivable purpose or effect. [Dkt. No. 33, 13–14]. Specifically, Defendant contends that "[i]nterpreting the scope of the Arbitration Agreement to exclude claims between Plaintiff Walker and any intended third party beneficiaries would" "not only render the conferral of rights to those intended beneficiaries meaningless," but also "essentially nullify the ability to arbitrate *any* 'Covered Claims' under the Arbitration Agreement." [*Id.* at 14] (emphasis original).

The latter of these two arguments is unconvincing. As Defendant itself concedes, Plaintiff was formally employed by Spherion throughout her tenure with Defendant. [*Id.* at 13]. Although the record does not describe the nature of that employment relationship in any detail, it is not difficult to imagine claims that she might assert against Spherion that would fall within the scope of the agreement. Imagine, for instance, that Spherion terminated Plaintiff on account of her race or

sex. Any Title VII claim Plaintiff chose to bring against Spherion would undoubtedly be subject to arbitration—seeing as such a claim would "relate to" Walker's "termination" and "arise between [her] and Spherion." [Dkt. No. 33-2, 4]. Other examples are not difficult to imagine.

Defendant makes a valid point about the third-party beneficiary clause. If the operative clause is deemed applicable only to claims arising between Spherion and Walker, it is difficult to imagine what rights Spherion's clients could possibly enforce as intended third-party beneficiaries of the contract.[14] But this fact does not ultimately move the needle. The Court's discretion begins and ends with ambiguity. The "words" of the operative clause are "clear and unambiguous"—Walker agreed to arbitrate only claims arising between her and Spherion. *Thompson*, 948 N.E.2d at 47. Nothing in the third-party beneficiary clause can expand or contract that limitation. *Salsitz*, 761 N.E.2d at 731 (arbitration agreements are not to be "extended by construction or implication"). Defendant must "must take the contract as [it] finds it and can get no more than the signatories provided." *Xinos*, 698 N.E.2d at 670.

Defendant invokes a principle of federal law—that, under the FAA, "'any doubts concerning the scope of arbitrable issues should be resolved in favor of

---

[14] The Court need ultimately need not consider every possibility—for instance, whether Spherion's clients might have the authority to compel Spherion and Walker to arbitrate their claims against their will, perhaps to avoid costly or intrusive federal discovery. Such an inquiry is unnecessary because the unambiguous language of the agreement is not susceptible to the interpretation Defendant puts forward, regardless of the surplusage it may or may not create. The Court cannot subvert the principle that unambiguous contract language must be given effect merely to avoid surplusage. The reality is that some contracts are defective. Where that is the case, it is not a judicial function to rewrite the parties' agreement under the guise of interpretation. The rational desire of Illinois courts to avoid surplusage is not a license to broker, *ex post*, a more rational arrangement.

arbitration.'" [Dkt. No. 33, 12] (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). But this principle applies "only where a validly formed and enforceable arbitration agreement is *ambiguous* about whether it covers the dispute at hand." *Granite Rock Co.*, 561 U.S. at 301 (emphasis added). It cannot create ambiguity where none exists. *Waffle House, Inc.*, 534 U.S. at 294 ("While ambiguities in the language of [an] agreement should be resolved in favor of arbitration, . . . we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated.").

The FAA was created, after all, "to place arbitration agreements on equal footing with other contracts," *id.* at 293, not to *favor* arbitration over alternative methods of dispute resolution. *Stone v. Doerge*, 328 F.3d 343, 346 (7th Cir. 2003) ("[T]here is no preference for arbitration over adjudication . . . . Our job . . . is to implement the *parties*' preferences between judicial and arbitral forums, not to displace that choice with one of our own." (emphasis original)). Thus, although it is true that "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses Cone*, 460 U.S. at 24–25, the FAA's "'provisions are not to be construed so broadly as to include claims that were never intended for arbitration.'" *Cont'l Cas. Co.*, 417 F.3d at 730 (quoting *Am. United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 929 (7th Cir. 2003)).

At the end of the day, Defendant's motion to compel founders on the fundamental principle that arbitration is "strictly 'a matter of consent,'" *Granite*

*Rock*, 561 U.S. at 299 (quoting *Volt Info. Scis.*, 489 U.S. at 479)—a "way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chi.*, 514 U.S. at 943. Even when viewed in conjunction with its neighboring third-party beneficiary provision, Walker's commitment to arbitrate "'Covered Claims' between [her] and Spherion" is susceptible to one meaning, and only one meaning. The Court must give that unambiguous language effect. Defendant's motion to compel arbitration is, accordingly, denied.[15]

### C.    Failure to State a Claim

That just leaves Defendant's motion to dismiss Plaintiffs' overtime claims on the merits. Although Defendant frames its motion as one to dismiss Plaintiffs' FLSA, IMWL, and OMFWSA claims in their entirety, *see, e.g.*, [Dkt. No. 33, 22] ("Plaintiffs fail to plead plausible claims under the FLSA, IMWL or OMFWSA and their claims should be dismissed."); [*Id.* at 23] (seeking dismissal of "Plaintiffs' FLSA, IMWL, and OMFWSA claims pursuant to FRCP 12(b)(6)"), Defendant does not actually advance or develop any argument for dismissing Plaintiffs' FLSA *recordkeeping* claim or Walker's claim under Article II, §34A of the Ohio Constitution. *See* [Dkt. No. 28, ¶¶ 46, 72, 76].[16] The Court therefore confines its analysis to the plausibility Plaintiffs' overtime claims.

---

[15]    Because the Court denies Defendant's motion on this ground, it need not reach Plaintiffs' alternative position that the arbitration agreement is unenforceable for lack of mutuality of obligation. *See* [Dkt. No. 35, 13–14].

[16]    That said, Plaintiffs cannot maintain a stand-alone private cause of action for record keeping violations under the FLSA." *Farmer v. DirectSat USA, LLC*, 2010 WL 3927640, at *12 (N.D. Ill. Oct. 4, 2010); *see also Bland v. Edward D. Jones & Co., L.P.*, 375 F. Supp. 3d 962, 985 (N.D. Ill. 2019). Only the Department of Labor has that authority. *Elwell v. Univ.*

"The FLSA requires employers to pay overtime to [non-exempt] employees who work more than 40 hours in a work week." *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011); 29 U.S.C. § 207(a). The overtime provisions of the IMWL, 820 ILCS 105/4a(1), and the OMFWSA, OHIO REV. CODE ANN. § 4111.03 (West 2022), parallel the FLSA, and courts examine claims brought under them according to the federal standard. *Haynes v. Tru-Green Corp.*, 154 Ill. App. 3d 967, 107 Ill. Dec. 792, 507 N.E.2d 945, 951 (Ill. App. Ct. 1987) ("The same analysis which applies to a violation of the FLSA applies to [the IMWL]."); *Chagoya v. City of Chi.*, 992 F.3d 607, 615 n.21 (7th Cir. 2021) (analyzing "FLSA and IMWL claims together"); *Stang v. Paycor, Inc.*, 582 F. Supp. 3d 563, 566–67 (S.D. Ohio 2022) ("The OMFWSA parallels the FLSA and courts approach issues regarding unpaid overtime raised under the FLSA and OMFWSA in a unitary fashion.").

Here, then, although Plaintiffs bring overtime claims separately under the FLSA, IMWL, and OMFWSA, the inquiry ultimately turns on a single question— whether Plaintiffs have pleaded "sufficient factual matter, accepted as true, to 'state a claim to relief'" under the FLSA "'that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). If Plaintiffs have not done so with respect to their FLSA claims, their IMWL and OMFWSA claims must be dismissed as well.

---

*Hosps. Home Care Servs.*, 276 F.3d 832, 843 (6th Cir. 2002). The Court will not dismiss this claim *sua sponte*, but this body of cases lurks in the background and will need to be addressed as this case moves forward. As to Walker's claim under Article II, § 34A, that provision—at least on its face—appears to guarantee minimum wage, not enhanced overtime compensation. This may also present issues for Plaintiffs moving forward, but the Court will not address them at this juncture.

With that in mind, the Court turns to the federal standard. An overtime claim under the FLSA is exceedingly straightforward—a "plaintiff states a claim for relief if she alleges that she was owed time-and-a-half for overtime work but did not receive it." *Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th 636, 639 (7th Cir. 2022). Although simple in theory, courts in the wake of *Twombly* and *Iqbal* diverged considerably over how much factual detail a Plaintiff needed to allege to state an overtime claim with the plausibility required by those cases—*i.e.*, to "'raise a right'" to overtime compensation "'above the speculative level.'" *McCauley*, 671 F.3d at 616; *see Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 114 (2d Cir. 2013) (surveying approaches); *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (same).

Although disagreement persists, it is fair to say that consensus is emerging on at least some points. For one, every Court of Appeals to have considered the question after *Iqbal* has held that overtime claimants must, at the very least, "provide sufficient factual allegations to support a reasonable inference that he or she worked more than forty hours in at least one workweek and that his or her employer failed to pay the requisite overtime premium for those hours." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 777 (4th Cir. 2017); *see also Landers v. Quality Cmmc'ns, Inc.*, 771 F.3d 638, 645 (9th Cir. 2014); *Davis*, 765 F.3d at 241–42; *Manning v. Boston Med. Ctr.*

*Corp.*, 725 F.3d 34, 46 (1st Cir. 2013); *Lundy*, 711 F.3d at 114.[17] In the absence of on-point circuit precedent, courts in this district have applied this standard as well.[18]

Drawing on this body of caselaw, the Seventh Circuit in *Hirst v. Skywest, Inc.*, applied an adapted version of the "at least one workweek" standard to minimum wage claims brought under 29 U.S.C. § 206. 910 F.3d 961, 966 (2018) ("[A] plaintiff alleging a federal minimum wage violation must provide sufficient factual context to raise a plausible inference there was at least one workweek in which he or she was underpaid."). Although the Seventh Circuit has yet to extend that holding to the overtime context, *Hirst* justified reliance on *Lundy*, *Hall*, and other overtime cases on the ground that "[t]he same principles for pleading overtime pay violation apply to minimum wage violations." *Id.* Accordingly, it seems highly likely that the Seventh Circuit—if presented with the opportunity—would apply the "at least one workweek" standard to overtime claims. And because the Seventh Circuit would, this Court will as well.

---

[17] In an unpublished decision issued by the Eleventh Circuit after *Twombly* was decided but before the Supreme Court issued its opinion in *Iqbal*, that Court found a complaint sufficient which alleged only that the Defendant "repeatedly violated . . . the FLSA by failing to pay covered employees minimum hourly wages and to compensate employees who worked in excess of fort hours a week at the appropriate rates." *Sec'y of Labor v. Labbe*, 319 Fed. App'x 761, 763–64 (11th Cir. 2008). Other circuits have roundly rejected the sufficiency of such threadbare allegations.

[18] *See, e.g.*, *Hughes v. Scarlett's G.P., Inc.*, 2016 WL 4179153, at *3 (N.D. Ill. Aug. 8, 2016); *Trujillo v. Mediterranean Kitchens*, 2017 WL 2958240, at *1 (N.D. Ill. July 11, 2017); *Hayes v. Thor Motor Coach, Inc.*, 2019 WL 6352493, at *3 (N.D. Ill. Nov. 27, 2019); *Bland v. Edward D. Jones & Co., L.P.*, 2020 WL 1503574, at *7 (N.D. Ill. Mar. 30, 2020); *Virgilio v. FTD, LLC*, 2023 WL 143225, at *5 (N.D. Ill. Jan. 10, 2023).

So what must Plaintiffs allege "to support a reasonable inference that he or she worked more than forty hours in at least one workweek"? *Hall*, 846 F.3d at 777. Not much, and certainly not, as Defendant claims, "how many workweeks they worked without proper compensation, at what rate Defendant paid them or the overtime rate at which Defendant should have paid them." [Dkt. No. 38, 12]; *Hall*, 846 F.3d at 777 ("[W]e emphasize that the standard we today adopt does not require plaintiffs to identify a *particular* week in which they worked uncompensated overtime hours."); *Landers*, 771 F.3d at 645 ("[W]e decline to make the approximation of overtime hours the *sine qua non* of plausibility for claims brought under the FLSA."); *Davis*, 765 F.3d at 243 ("[W]e do not hold that a plaintiff must identify the exact dates and times that she worked overtime."); *cf. Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 88 (2d Cir. 2013) (noting that the Court's decision in *Lundy* "declined to make an approximation of overtime hours a necessity in all cases").

But Plaintiffs *do* need to provide factual context—beyond threadbare allegations of uncompensated overtime—sufficient to "'nudge'" their claims "'from conceivable to plausible.'" *Hall*, 846 F.3d at 777 (quoting *Dejesus*, 726 F.3d at 90). And they cannot satisfy this standard by "parrot[ing] the statutory language of the FLSA." *Landers*, 771 F.3d at 643. There is nothing groundbreaking in this. The Supreme Court in *Twombly* expressly recognized the ease with which legal conclusions can be "'couched as . . . factual allegation[s],'" 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (2007)), and safeguarded against such sleight-of-hand by denying the presumption of truth not only to legal conclusions in their

purest sense, but also to factual allegations that amount to nothing more than a "formulaic recitation of the elements of a cause of action." *Id.*; *see also Olson v. Champaign Cnty., Ill.*, 784 F.3d 1093, 1099 (7th Cir. 2015) ("[F]actual allegations must be more than '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" (quoting *Iqbal*, 556 U.S. at 678)).

*Dejesus* illustrates the point well. In that case, the Second Circuit affirmed the district court's dismissal of an overtime claim, in spite of the fact that the Plaintiff "alleged that she worked more than forty hours per week during 'some or all weeks' of her employment," and "was not paid at a rate of at least 1.5 times her regular wage for each hour in excess of forty hours." 726 F.3d at 86. The Court did not assume the truth of these allegations, which merely "tracked the statutory language of the FLSA, lifting its numbers and rehashing its formulation, but alleging no *particular* facts" specific to the plaintiff's situation. *Id.* at 89–90 (emphasis added).

Applying these principles to the allegations of the First Amended Complaint, the Court holds that Plaintiffs have not pleaded sufficient factual context to nudge their claims from conceivable to plausible. Most glaringly, Plaintiffs do not actually allege that they worked more than 40 hours in *any* workweek. The complaint alleges only that "Plaintiffs and other similarly-situated employees regularly worked 40 *or more* hours per week." [Dkt. No. 28, ¶ 28] (emphasis added). Because this allegation is phrased in the disjunctive, it can be true even if Plaintiffs did not once work more than 40 hours in a week. Therefore, even if the Court were inclined to accept this allegation as true (rather than reject it as a formulaic recitation of an element of the

FLSA), it would not "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *McCauley*, 671 F.3d at 615 (quoting *Iqbal*, 556 U.S. at 678). This may seem overly technical, but the Court can only accept the truth of the complaint's allegations as written.

Although this alone requires dismissal, the complaint would fall short even if it alleged that Plaintiffs regularly worked "more than 40 hours in a week." As the Fourth Circuit explained in *Hall*, "plaintiffs seeking to overcome a motion to dismiss must do more than merely allege that they regularly worked in excess of forty hours per week without receiving overtime pay." 846 F.3d at 777. Such an allegation must be supported with specific factual context. What this context could look like varies with the case. The Fourth Circuit identified several examples, including, for instance, estimates of "'the length of [the plaintiff's] average workweek during the applicable period.'" *Id.* (quoting *Landers*, 771 F.3d at 645). Plaintiffs' complaint is completely devoid of such factual context and fails on this ground as well.

For these reasons, the Court grants Defendant's motion to dismiss Plaintiffs' overtime claims under the FLSA, IMWL, and OMFWSA alike. The Court stresses, however, that Plaintiffs should not have much difficulty addressing the deficiencies identified by this opinion. Defendant is simply incorrect in suggesting that Plaintiffs must "identify [a] full workweek[] where they worked in excess of forty hours," "specify how many workweeks they worked without proper compensation," or "attempt to quantify . . . how many hours per week they are owed overtime compensation." [Dkt. No. 33, 22]. As the Second Circuit noted in *Dejesus*, the pleading

standard does not require "plaintiffs to keep careful records and plead their hours with mathematical precision." 726 F.3d at 90. It simply places on them an obligation to "draw on" their "memory and experience" to craft a complaint with more "developed factual allegations." *Id.* The Court leaves it to Plaintiffs to determine how best to do that, but does not expect that they will have any difficulty with the benefit of the cases cited.

## IV. Conclusion

For the reasons stated herein, Defendant's motion to compel arbitration and to dismiss is granted in part and denied in part. Defendant's motion is denied to the extent it seeks to compel Plaintiff Walker to arbitrate her claims and to the extent it seeks to dismiss the nationwide Fair Labor Standards Act claim for lack of personal jurisdiction. It is granted to the extent it seeks dismissal of Plaintiffs' overtime claims for failure to state a claim. Plaintiffs are granted leave to file a Second Amended Complaint correcting the deficiencies identified by this opinion.

Enter:    21-cv-5780
Date:    August 18, 2023

Lindsay C. Jenkins
United States District Court Judge

37